UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MONICA TERMINE                                        CIVIL ACTION

VERSUS                                               NO. 17-5824

NANCY A. BERRYHILL, ACTING                          SECTION "N" (2)
COMMISSIONER OF SOCIAL SECURITY

### FINDINGS AND RECOMMENDATION

Plaintiff, Monica Termine, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. § 1382c. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.    PROCEDURAL HISTORY

Termine filed her application on August 27, 2014, alleging disability since July 26, 2007, due to two herniated discs, a titanium plate in her neck, three cervical disc surgeries, back problems, carpal tunnel syndrome, ulcer disease and depression. (Tr. 151, 174). After her claim was denied at the agency level, she requested a hearing before an Administrative Law Judge (ALJ), which was held on August 11, 2015. (Tr. 32-57). The ALJ issued a decision denying the application on September 10, 2015. (Tr. 17-26). After the Appeals Council denied review on April 20, 2017, the ALJ's decision became the Commissioner's final decision for purposes of this court's review. (Tr. 1-5).

Plaintiff filed a timely memorandum in support of her appeal. Record Doc.

No. 22. Defendant filed a timely reply memorandum. Record Doc. No. 23.

II.    STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the Commissioner made the following errors:

A.    The ALJ's findings that Termine has the residual functional capacity to make a successful adjustment to work that exists in significant numbers in the national economy are not supported by substantial evidence.

B.    The ALJ did not follow proper legal standards in determining how much weight to accord the opinions, diagnoses and medical evidence of treating physicians as compared to the opinions of state-appointed examiners.

C.    The ALJ failed properly to consider evidence indicating that plaintiff did not have the residual functional capacity to "sustain" any significant gainful employment.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.    Plaintiff has not engaged in substantial gainful activity since August 21,[1] 2014, the date of her application for SSI.

2.    She has severe impairments consisting of status post anterior cervical discectomy, polysubstance abuse and carpal tunnel release.

3.    Termine does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.    Plaintiff has the residual functional capacity to perform light work, including frequent handling and fingering, except that she may occasionally climb ramps and stairs; occasionally stoop, bend and crouch; never crawl

---

[1]The ALJ stated throughout his opinion that the application date was August 21, although it was actually August 27, 2014.

or reach overhead; never climb ropes, ladders or scaffolds; and is limited to simple, routine, repetitive tasks.

5.    Her medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

6.    Termine can perform her past relevant work as a waitress.

7.    Alternatively, considering plaintiff's age, education, work experience and residual functional capacity, jobs exist in significant numbers that she can perform, such as customer service representative, general office clerk and information clerk.

8.    Termine has not been under a disability since August 21, 2014, the date of her application.

(Tr. 19-25).

IV.    ANALYSIS

    A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v. Colvin, 544 F. App'x 358, 360 (5th Cir. 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  McCaskill v. Dep't of Health & Human Servs., 640 F. App'x 331, 332-33 (5th Cir. 2016) (citing Perez, 415 F.3d at 461); Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2015).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[2]  Id. §§ 404.1520, 416.920; Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue,

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

Termine testified at the hearing that she was 47 years old, had a tenth grade education and last worked in 2007 as a waitress at Harrah's. (Tr. 35-36). She said she had undergone three surgeries. She stated that she had previously filed an application for benefits after she stopped working, which was denied, and again after her second surgery

6

in 2008, which she failed to pursue. She testified that she decided to file her current application after her third surgery in 2013 because she was not getting any better and could not go back to work. (Tr. 38).

Plaintiff said she lives with her boyfriend and her 24-year-old son, both of whom are employed. She testified that, on a typical day if she had a good night's sleep, she gets up and does some activities around the house slowly. She stated that she can do housework if "it's all broken up." She said she can fold a load of clothes and towels, but can only fold about eight towels because her neck gets tired from lifting her arms to hold up the towels. She stated that she then rests or washes the dishes.

Termine testified that she drives herself to the doctor or the grocery store, which is about one and one-half miles from her house. She said she cannot turn her head from side to side, but does not have to turn her head much because she is familiar with the routes. (Tr. 39).

Plaintiff stated that her daughter and eight-year old grandson live with her during the summer. She said she watches her grandson and that he helps her a lot. She said she used to take vacations, but has not traveled in a very long time. She denied having taken a recent trip to Georgia, which the ALJ had seen mentioned in her medical records. She testified that she was going to take that trip, but did not do it. (Tr. 40-41).

Termine said she is not using illegal drugs. When the ALJ noted that plaintiff had tested positive for cocaine once, Termine testified that her grandchild had passed away.

She clarified that the cocaine use happened before her grandchild's death, on a night when she lost another family member or some other event happened, and she testified that she had not used any illegal drugs since then.  She stated that her doctor at that time wanted her to stop taking narcotics and that she did so for about three months, while still taking gabapentin[3] and other non-narcotic medications.  She said she then started seeing Dr. Meda Colvin, who put her back on narcotics, after plaintiff saw a psychotherapist who confirmed that she was "fine."  (Tr. 41-42).  Termine stated that she still sees Dr. Colvin and takes regular drug tests for her.

Upon questioning by her attorney, plaintiff testified that she stays home, except to go to the doctor and the store, and she goes nowhere for chores or for fun.  She stated that the last event she attended was a benefit for her grandson after he died.  She said she does not like to go to the mall or other crowded places because she is afraid of being hit or injured in a crowd and that her doctor has warned her about that.  (Tr. 42-43).

Termine stated that she cannot turn her head all the way from one shoulder to the other.  She said she cannot shave under her arms because she cannot look down and has to look in a mirror to shave under her arms.  She testified that, if she does anything that requires turning her head from side to side more than a few times, her neck will be

---

[3]Neurontin (generic name: gabapentin) is "used to treat pain from damaged nerves that follows healing of shingles in adults. Neurontin is also used to treat partial seizures when taken in combination with other medicines in adults and children."  PDR+ (PDR, LLC 2018), http://www.pdr.net/pdr-consumer-monograph/neurontin?druglabelid=2477&ConsumerId=1289 (last visited Mar. 22, 2018).

irritated, tight and swollen, and her shoulders and arms will burn. She stated that her fingers get numb and she drops things. She said that, the more active she is, the more pain she feels. She described the pain as feeling like she has constantly carried heavy "bales of water" across her neck for about three days, which makes her neck feel heavy and very uncomfortable and her shoulders feel tight, burn and throb. (Tr. 43-44).

Plaintiff testified that her last surgery affected her ability to lean her neck forward and backward, so that she can no longer drink a can of soda by tilting her head back and must instead use a straw. She stated that it hurts to lean her head back and that she cannot touch her chin to her chest. She said she does not read because she can only hold her neck and arms in a position to read a book for about 10 minutes before she must put the book down because her arms and neck hurt.

Termine testified that she has trouble holding her arms out or overhead. She stated that lifting something, like a pie or her purse, causes burning pain because of pressure on her spine. She said that picking up her purse from the floor is more painful than picking it up from a counter. She testified that her grandson helps her by taking a gallon bottle of bleach off a shelf and handing it to her to use in the washing machine, even if the bottle is not full, and he takes the milk off the top shelf of the refrigerator, which would be uncomfortable for her. (Tr. 45-46).

Plaintiff stated that Dr. John Steck performed a carpal tunnel release on her right hand, but that her left hand is "messed up." She said that Dr. Steck wanted to do surgery

9

on both hands, but not at the same time, which would have left her with no functioning hand, and that he decided to postpone surgery on her left hand until some later time.

Termine testified that she has numbness, burning, tingling and swelling in her hands. She said she uses a mechanical lid opener because she has problems opening lids, and has difficulty buttoning buttons. She stated that she cannot zip up a zipper behind her back or fix her own hair because these actions make her arms and neck hurt. She stated that her husband straightens her hair for her because she cannot do the constant up and down motion of straightening her hair. (Tr. 46-47).

Plaintiff said she is never pain-free and that any activity, including taking a shower or washing her hair, worsens her pain. She testified that pain interferes with her ability to pay attention or concentrate. She said she tried to perform an office job at Harrah's after her first surgery, but was unable to do it, and she returned to working on "the floor" after a few months. (Tr. 47-48). She stated that working in the office was more painful than carrying a tray for four hours with breaks, but that eventually she could not carry trays any more.

Termine said she would like to work, but would have to take constant breaks and would miss days. She testified that some days she is "perfectly okay." She stated that, although her pain is always present, her pain level is not as high if she had a good night's sleep or the weather is not bad, but that she "might be in severe pain" on other days. She said it takes her two or three days to do some gardening, but then she suffers for two or

three days afterwards. (Tr. 48). She stated that she does not mop her house and that her son, daughter or sister does the mopping.

Plaintiff testified that she was diagnosed the previous year at Tulane with a hernia in her stomach and that the doctor discussed performing surgery, but that she was not ready to have another surgery while she was still dealing with her neck problems. She said she does not have medical insurance and does not go to "the female doctor" like she should. She said she has a sciatic nerve problem in her lower back. While sitting at the hearing, Termine stated that she was uncomfortable, her lower back and leg were burning and her neck was starting to get tight. She said she can only sit for 10 to 15 minutes comfortably. (Tr. 49-50). She testified that standing is "tricky" and depends on how her back feels, but that she can stand for about 45 minutes, which is longer than she can do anything else.

Plaintiff said she only sees close family members and seldom leaves the house because her husband works and she does not drive, except to go to a doctor's office or the grocery store. She stated that her daughter or husband[4] usually drives. (Tr. 50).

Termine testified that her medications do not take her pain away completely, but give her enough relief to let her do things. She complained that her pain medications give her "that false feeling that, okay, I feel fine," so she cleans her house and does not

_____

[4]At this point, Termine referred to her husband as her "boyfriend." She later clarified that he is no longer her husband (Tr. 52), but she calls him that for the most part throughout her testimony.

feel pain until several hours later when the medicines wear off "and then I feel my pain even 10 times more than I did before." She said she has tried physical therapy and injections, but she continues to take narcotics because they "relieve the pain to a good degree that I can stay in it" and they "are the only thing I found so far that really relieves it." (Tr. 51-52). She said that professional massages also help, but that it hurt too much when her husband tried to massage her.

Plaintiff stated that her medications cause sleepiness and an inability to focus well. She said she does not take Zanaflex[5] or trazodone[6] during the day because they make her too drowsy. She asked the ALJ if she could stand up at this point in the hearing. (Tr. 52).

C.    Vocational Expert Testimony

A vocational expert, Patricia Riggle, testified at the hearing that plaintiff's past work as a waitress was light[7] and semi-skilled. (Tr. 53). The ALJ posed a hypothetical

---

[5]Zanaflex (generic name: tizanidine hydrochloride) is a muscle relaxer. PDR+, http://www.pdr.net/pdr-consumer-monograph/zanaflex?druglabelid=811&ConsumerId=1638 (last visited Mar. 22, 2018).

[6]Trazodone hydrochloride is used to treat depression. Id., http://www.pdr.net/pdr-consumer-monograph/trazodone?druglabelid=3033&ConsumerId=1128 (last visited Mar. 22, 2018).

[7]The Commissioner's regulations define "light work" as "work [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Because of the "frequent" lifting or carrying requirement, "'the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.'" Ramos v. Berryhill, No. EP-14-CV-433-MAT, 2017 WL 4820548, at *3 (W.D. Tex. Oct. 23, 2017) (quoting SSR 83-10, 1983 WL 31251, at *6 (1983)); accord Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988). A person who can work at the light level necessarily can work at the less strenuous sedentary level. 20 C.F.R. § 416.967(b).

of a person with the same age, education and work experience as Termine, who can perform light work, except she would be restricted to climbing stairs, stooping or bending occasionally; could never kneel, crawl, reach overhead or climb ladders or scaffolds; could perform frequent handling and fingering; and is limited to simple, routine, repetitive tasks. (Tr. 53-54). Riggle testified that the job of waitress is semi-skilled, but involves simple, routine work, so the hypothetical person could do that job.

The vocational expert stated that the individual could also perform other jobs available in the state and national economies, such as customer service representative, general office clerk and information clerk. (Tr. 54). Riggle did not testify about the strength level of these three jobs, but according to the <u>Dictionary of Occupational Titles</u>, the job of information clerk is sedentary, general office clerk is light and, depending on the industry, customer service representative is either sedentary or light.[8]

The ALJ modified the hypothetical to include difficulty with concentration that would occasionally interfere with job functions up to 30 percent of the work day. Riggle testified that this limitation would preclude all the jobs she had identified. She stated that the customary tolerance for absences from work is about ten days per year.

---

[8]<u>Dictionary of Occupational Titles</u>, information clerk, https://occupationalinfo.org/23/237367022.html; general office clerk, <u>id.</u>, https://occupationalinfo.org/20/209562010.html; customer service representative, <u>id.</u>, https://occupationalinfo.org/23/239362014.html, or <u>id.</u>, https://occupationalinfo.org/20/205362026.html, https://occupationalinfo.org/24/241267034.html (last visited Apr. 4, 2018).

Plaintiff's attorney modified the ALJ's first hypothetical to include a limitation to lifting less than 10 pounds occasionally and 10 to 20 pounds rarely and asked if such a person could work as a waitress or customer service representative. Riggle testified that the restriction would exclude the waitress job, but not the customer service representative job. (Tr. 55).

Plaintiff's attorney added a limitation that the hypothetical person could rarely twist her neck from side to side or "lean upwards or forwards at the neck," and asked whether Termine could perform the jobs of waitress or customer service representative with that limitation. (Tr. 55-56). Riggle stated that this individual could not perform either of those jobs, but could work as an information clerk. Counsel further modified the hypothetical so that the person cannot perform frequent handling or fingering and requires two to three unscheduled 15-minute breaks, totaling 45 minutes, during the work day. Riggle testified that such a person could not perform any job. In response to another question by plaintiff's attorney, the vocational expert stated that a person who has to take three or more unscheduled days of absence per month would not be able to do any work. (Tr. 56).

D.    <u>Medical Evidence</u>

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 19-20, 22-24). I find the ALJ's summary substantially correct

and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

    E.    <u>Plaintiff's Appeal</u>

        1.    The relevant evidentiary time period is 12 months before plaintiff's <u>application date through the date of the ALJ's decision.</u>

As an initial matter, Termine alleges a disability onset date of July 26, 2007, but "[c]laimants applying to the SSI program may <u>not</u> receive payments for a period predating the month in which they apply for benefits." <u>Rosetti v. Shalala</u>, 12 F.3d 1216, 1224 n.20 (3d Cir. 1993) (citing 20 C.F.R. § 416.335) (emphasis added); <u>accord</u> <u>Brown v. Apfel</u>, 192 F.3d 492, 495 n.1 (5th Cir. 1999). "'Thus, the month following an application fixes the earliest date from which SSI benefits can be paid.'" <u>Harris v. Comm'r of Soc. Sec. Admin.</u>, No. 16-749-EWD, 2018 WL 627559, at *1 (M.D. La. Jan. 30, 2018) (quoting <u>Clarke v. Astrue</u>, No. 4:12-0350, 2013 WL 105017, at * 4 (S.D. Tex. Jan. 8, 2013) (citing <u>Brown</u>, 192 F.3d at 495 n.1; 20 C.F.R. § 416.335)).

Termine therefore must establish her eligibility for SSI as of her application date. <u>Cross o/b/o T.C. v. Berryhill</u>, No. 3:16-CV-899-HTWJCG, 2018 WL 1163302, at *4 (S.D. Miss. Jan. 30, 2018), <u>report & recommendation adopted</u>, 2018 WL 1162487 (S.D. Miss. Mar. 5, 2018) (citing <u>Jones v. Colvin</u>, No. H-14-1249, 2016 WL 861334, at *11 (S.D. Tex. Jan. 28, 2016); <u>Johns v. Colvin</u>, No. 3:13-cv-4420-N-BH, 2015 WL 1428535, at *12 (N.D. Tex. Mar. 30, 2015); <u>Chiles v. Colvin</u>, No. 3:12-cv-3516, 2014 WL 630888,

at *9 (N.D. Tex. Feb. 18, 2014); <u>Slaughter v. Astrue</u>, 857 F. Supp. 2d 631, 635 n.42 (S.D.

Tex. 2012); <u>Plaisance v. Astrue</u>, No. 07-8242, 2008 WL 4808852, *1 (E.D. La. Oct. 31,

2008)).  Although the ALJ reviewed plaintiff's medical records from 2005 through July

7, 2015, the relevant evidentiary time period is the 12 months preceding Termine's

application date of August 27, 2014 through September 10, 2015, the date of the ALJ's

decision.  20 C.F.R. § 416.912(b)(1).

    2.    The ALJ's findings regarding Termine's residual functional capacity <u>are supported by substantial evidence.</u>

    3.    The ALJ followed proper legal standards in determining how much <u>weight to accord the medical opinions.</u>

Because plaintiff's arguments regarding her first assignment of error implicate her

similar arguments regarding her second assignment, the court addresses the two

assignments together.

Before deciding at step four of the sequential evaluation whether a claimant can

return to her past relevant work, the ALJ must determine her residual functional capacity,

which is the person's "ability to do physical and mental tasks on a sustained basis despite

limitations from her impairments.  In . . . [making this determination], the Commissioner

must consider all of a claimant's impairments, including those that are not severe."  <u>Giles</u>

<u>v. Astrue</u>, 433 F. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(e),

404.1545).  Residual functional capacity "is a determination of the most the claimant can

still do despite [her] physical and mental limitations and is based on all relevant

evidence." <u>Perez</u>, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).  The ALJ is solely responsible for assessing the medical evidence and determining the claimant's residual functional capacity.  <u>Taylor v. Astrue</u>, 706 F.3d 600, 602-03 (5th Cir. 2012).

The ALJ found that Termine has the residual functional capacity to perform light work, including frequent handling and fingering, except that she may only occasionally stoop, bend, crouch and climb ramps and stairs; never crawl, reach overhead or climb ropes, ladders or scaffolds; and is limited to simple, routine, repetitive tasks.  At step four, the ALJ found that plaintiff can perform her past relevant work as a waitress.  Alternatively, the ALJ found at the fifth step that she can perform other available jobs, such as customer service representative, general office clerk and information clerk.

In her first assignment of error, Termine argues that the ALJ's residual functional capacity findings are not supported by substantial evidence.  For this argument, she relies primarily on two residual functional capacity checklist questionnaires completed by her treating neurosurgeon, John Steck, M.D.  The first questionnaire (Tr. 568-72) is undated, but plaintiff's attorney submitted it to the Commissioner on October 24, 2014 (Tr. 567), and the parties refer to it in their memoranda as the October 24th opinion.  However, Termine saw Dr. Steck on October 2, 2014 (Tr. 519), and the Commissioner's records refer to the first questionnaire as Dr. Steck's October 2nd opinion.  (Tr. 60, 64, 67, 69).  The court will refer to it as the October 2014 questionnaire.  The second questionnaire

17

is dated April 16, 2015 (Tr. 582-86), and Dr. Steck's opinions therein are very similar to those in the October 2014 questionnaire.

In the two questionnaires, Dr. Steck opined that plaintiff's neck and shoulder pain would either constantly (Tr. 569, in October 2014) or frequently (Tr. 583, on April 16, 2015) interfere with the attention and concentration needed to perform even simple work tasks; that she would need to take unscheduled breaks either for 15 minutes at a time three times per work day (Tr. 570, in October 2014) or for an unknown length and number of times (Tr. 584, on April 16, 2015); and that she would likely be absent from work about three days per month. (Tr. 571, 585). The vocational expert testified that a person with these limitations would not be able to sustain any work. (Tr. 55-56). Termine also relies on Dr. Steck's opinions in both questionnaires that she could occasionally lift and carry up to 10 pounds only; could rarely twist, stoop or crouch; and would have "significant" (but unquantified) limitations in her ability to perform repetitive reaching, handling or fingering. (Tr. 571, 585).

In her statement of facts, although not in her arguments, Termine highlighted Dr. Steck's "To Whom It May Concern" letter dated March 11, 2014, in which he opined that plaintiff had reached maximum medical improvement as of February 13, 2014 (one year after her third neck surgery and right carpal tunnel release). Dr. Steck stated in the letter that Termine "has a permanent partial impairment" and he did "not think she is able to return to sedentary work as she continues to have chronic pain and is on narcotics.

I think if she would return to work she would be at significant risk of increasing her pain, which will lead to need for further treatment." (Tr. 522).

The ALJ gave little weight to Dr. Steck's opinions. (Tr. 23). Termine argues in her first assignment of error that Dr. Steck's opinions are consistent with her treatment records and should have been afforded great weight, and that the ALJ put "undue weight" on the opinions of Joseph Michalik, M.D., a non-examining physician who reviewed the medical evidence of record and issued his residual functional capacity findings on November 19, 2014. (Tr. 67-69). Plaintiff's argument implicates her second assignment of error that the ALJ did not follow proper legal standards in determining how much weight to accord the opinions of her treating physicians, which she contends should have been afforded controlling weight, as compared to Dr. Michalik's opinions.

Dr. Michalik reviewed the medical evidence and opined that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were only partially consistent with the objective evidence. (Tr. 67, 69). Dr. Michalik gave "great weight" to Dr. Steck's opinions dated March 11, 2014 and October 2, 2014 because he noted that they were consistent with plaintiff's treatment at the time. (Tr. 67). However, Dr. Michalik stated that Dr. Steck's March 11th opinion on Termine's disability concerns an issue reserved to the Commissioner and that "Dr. Steck's opinions [on that date] were given during post cervical surgeries. In recent medical evidence he does not have the same opinion." (Tr. 70). Based on the entire record, Dr. Michalik opined that Termine

19

is capable of performing light work, except that she could occasionally stoop, kneel, crawl, crouch and climb ramps or stairs, and never climb ladders, ropes or scaffolds. The ALJ gave great weight to Dr. Michalik's opinions and largely incorporated them into his residual functional capacity findings, except the ALJ imposed greater restrictions than Dr. Michalik in plaintiff's ability to engage in handling and fingering and to crawl or reach overhead, and the ALJ limited her to simple, routine, repetitive tasks because her pain and polysubstance abuse would limit her ability to concentrate. (Tr. 20, 23).

Before addressing the ALJ's findings regarding the weight he gave the opinions of Drs. Steck and Michalik, the court finds that three of Termine's other arguments under her first assignment of error are unavailing because they are based on factually incorrect assertions. First, she relies on the 2010 opinions of Andrea P. Toomer, M.D., a pain management specialist who treated her from 2009 through 2012, which was long before the time period relevant to plaintiff's application for SSI. Dr. Toomer opined on July 23 and October 22, 2010 that Termine could occasionally lift 15 pounds and carry 10 pounds and should avoid repetitive arm motions. (Tr. 355, 357). The ALJ accorded little weight to Dr. Toomer's opinion. (Tr. 23).

Plaintiff argues incorrectly that the ALJ did not state a reason for this assessment. The ALJ explained that the only objective finding in the medical evidence at that time was decreased range of motion, which the ALJ found did not support the limitations that Dr. Toomer imposed. In addition, Dr. Toomer's opinions do not substantially support

plaintiff's allegations of disability because her July 23, 2010 report was <u>more than three</u>

<u>years before</u> the beginning of the relevant evidentiary time period on August 27, 2013,

and it predated by more than two years Termine's neck surgery and right carpal tunnel

release on February 13, 2013, which affected plaintiff's cervical condition and right

carpal tunnel syndrome.  (Tr. 467).  Even if Dr. Toomer's opinions were from a relevant

time period, they do not substantially support a finding of disability because she actually

opined on July 23 and October 22, 2010 and again on January 20, 2011 that Termine

<u>could</u> perform sedentary work with the limitations imposed.  (Tr. 351, 355, 357).  An

ability to perform sedentary work is consistent with some of the jobs that the ALJ found

plaintiff capable of performing at step five of the sequential evaluation.  (Tr. 25).

Second, Termine erroneously states that the ALJ's summary of her subjective

complaints <u>from her testimony</u> (Tr. 22) constituted the ALJ's "assessment" of her

limitations, which the ALJ should have incorporated into his residual functional capacity

determination.  Record Doc. No. 22 at p. 11.  Plaintiff's testimony is insufficient to

establish disability because subjective complaints of pain or other symptoms must be

corroborated by objective medical evidence.  <u>Quijas v. Astrue</u>, 298 F. App'x 391, 393

(5th Cir. 2008) (citing <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001));

<u>Harper v. Sullivan</u>, 887 F.2d 92, 96 (5th Cir. 1989).

Third, plaintiff incorrectly asserts that Meda Colvin, M.D., a physical medicine

and rehabilitation specialist who treated her from November 26, 2014, through June 17,

2015 (Tr. 588-605), placed the same restrictions on her ability to function as did Dr. Toomer.   However, Dr. Colvin did <u>not</u> assess any limitations.   Dr. Colvin noted plaintiff's subjective complaints and diagnosed her conditions as chronic pain, anxiety, insomnia, neuropathic pain, muscle spasms and arthritis.   The mere diagnosis of and treatment for an impairment do not establish a claimant's disability claims.   <u>Bordelon v. Astrue</u>, 281 F. App'x 418, 422 (5th Cir. 2008) (citing <u>Hames v. Heckler</u>, 707 F.2d 162, 165 (5th Cir. 1983)); <u>McLendon v. Barnhart</u>, 184 F. App'x 430, 431 (5th Cir. 2006); <u>Harris v. Barnhart</u>, 65 F. App'x 129, 132 (9th Cir. 2003); <u>Estok v. Apfel</u>, 152 F.3d 636, 640 (7th Cir. 1998); <u>Jones v. Sullivan</u>, 954 F.2d 125, 128 (3d Cir. 1991); <u>Arroyo v. Sec'y of Health & Human Servs.</u>, 932 F.2d 82, 87-88 (1st Cir. 1991).

As to plaintiff's arguments regarding the weight the ALJ gave to the opinions of her treating physician, Dr. Steck, and the reviewing physician, Dr. Michalik, the court finds that the ALJ applied the appropriate legal standards and that substantial evidence supports his decision.   The ALJ afforded great weight to Dr. Michalik's opinions because he found them to be supported by the medical evidence.   The ALJ gave Dr. Steck's opinions little weight because he found them to be inconsistent with plaintiff's treatment notes and based largely on her subjective complaints, which he found were not supported by the objective findings and were not entirely credible.[9]

---

[9]         Effective March 16, 2016, the Social Security Administration eliminated "use of the term 'credibility' from [its] sub-regulatory policy" and in doing so, clarified "that subjective symptom evaluation is not an

It is well established that

> [t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.  The opinion of a specialist generally is accorded greater weight than that of a non-specialist.
>
> Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  [T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  The treating physician's opinions are not conclusive.  The opinions may be assigned little or no weight when good  cause is shown.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted) (ellipsis and brackets in original) (emphasis added).

The ALJ's decision demonstrates that he carefully considered and weighed all the evidence.  Dr. Michalik reviewed the entire medical record as of November 17, 2014.

---

examination of an individual's character." Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2016 WL 1020935, at *1 (S.S.A. Mar. 16, 2016).  When the ALJ issued her decision, SSR 96-7p was the relevant social security ruling and specifically used the term "credibility."  See Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7P, 1996 WL 374186, at *7 (S.S.A. July 2, 1996).

Davis v. Berryhill, No. 4:16-CV-0429-O-BL, 2017 WL 3701689, at *11 n.13 (N.D. Tex. Aug. 10, 2017), report & recommendation adopted, 2017 WL 3674856 (N.D. Tex. Aug. 25, 2017).  SSR 96-7p was still in effect when the ALJ rendered his decision in the instant case.

He explained that he assessed less restrictive residual functional capacity limitations than Dr. Steck did in his March 2014 letter opinion because that opinion was rendered during plaintiff's post-cervical surgery period and because Dr. Steck did not have the same opinion in more recent medical evidence. (Tr. 70). Dr. Michalik acknowledged that Dr. Steck's October 2014 opinion was more restrictive than Dr. Michalik's (Tr. 69), but Dr. Michalik explained his findings, stating that plaintiff's recent physical examinations revealed a normal gait and no neurological deficits; she had been released from several pain management programs for narcotics abuse, which undermined her credibility; and her alleged physical limitations were only partially consistent with the objective findings. (Tr. 68-69).

The ALJ found that Dr. Michalik's opinions were entitled to great weight and Dr. Steck's opinions merited little weight. The ALJ's stated reasons were that the only objective finding in the record since plaintiff's third surgery was a decreased range of motion; her x-rays showed a solid arthrodesis;[10] she had normal neurological examinations and only occasional cervical spine tenderness on physical examination; and no physician, including Dr. Steck, had placed any restrictions on her ability to sit, stand or walk. (Tr. 23). The ALJ also found that the credibility of plaintiff's subjective complaints was diminished by her history of drug-seeking behavior and non-compliance

---

[10]Arthrodesis is the stiffening of a joint by operative means. Stedman's Medical Dictionary (Wolters Kluwer Health 2018), http://www.medilexicon.com/dictionary/7583 (last visited Apr. 10, 2018).

with physical therapy. (Tr. 23-24). The ALJ's reasons are substantially supported by the evidence.

In making these findings, the ALJ considered the evidence filed in the record both before and after Dr. Michalik's November 2014 assessment, including Dr. Steck's April 16, 2015 checklist opinion, which was very similar to his October 2014 checklist opinion that Dr. Michalik discounted. As Dr. Michalik stated and as more recent records continued to show, Dr. Steck consistently noted since plaintiff's February 2013 neck and carpal tunnel surgery that she had normal or stable neurological examinations with no objective findings in her neck or extremities on physical examination. (Tr. 519-21, 523, 531, 581). Dr. Steck noted on August 1 and October 31, 2013, and March 12, 2015, that plaintiff's x-rays showed a solid arthrodesis with successful treatment of her cervical pseudarthrosis[11] (Tr. 524, 526, 581), which had been her pre-surgical diagnosis. (Tr. 533, 557). Both of Dr. Steck's checklist opinions confirm that Termine had decreased range of motion in her neck (Tr. 568, 583), but no muscle weakness, muscle spasm, muscle atrophy, sensory loss, positive straight leg raising test or other "positive objective signs" to support her limitations. (Tr. 569, 583). Dr. Steck even stated in his April 16, 2015 opinion that plaintiff's impairments were not reasonably consistent with the symptoms and functional limitations that he described (Tr. 583), which contradicted his statement

---

[11]Pseudarthrosis (or pseudoarthrosis) is a "new, false joint arising at the site of an ununited fracture." Id. http://www.medilexicon.com/dictionary/73289 (last visited Apr. 10, 2018).

to the contrary in his October 2014 checklist opinion. (Tr. 569). He declined in both questionnaires to place any restrictions on how long Termine could sit, stand or walk. (Tr. 569-70, 583-84).

Satvik Munshi, M.D., is a pain management physician who began treating Termine on May 28, 2014 and discharged her on August 21, 2014, with instructions to wean her off the opioid medication he had been prescribing because a drug screen revealed her use of cocaine and non-prescribed prescription drugs. (Tr. 386). At each visit during his treatment of plaintiff, Dr. Munshi noted that her physical and neurological examinations were unremarkable, except for decreased range of motion and tenderness in her neck. (Tr. 384-86, 389-91, 400-02). Termine also had grossly normal physical examinations with full range of motion in all extremities when she visited the West Jefferson Medical Center emergency room for minor injuries on May 1, 2013 and August 25, 2014. (Tr. 409-14, 419-24).

Dr. Colvin, who became plaintiff's pain management physician on November 26, 2014, noted at the initial visit that Termine's functional status was "independent" and that she had not been doing her home physical therapy program. Dr. Colvin observed that plaintiff had decreased range of motion with pain in her neck and some paraspinal muscle wasting bilaterally, but her physical and neurological examination was otherwise normal. (Tr. 605). On March 20, 2015, Dr. Colvin noted that Termine had decreased range of motion and tightness in her neck muscles because of a musculoskeletal strain

26

suffered in a recent motor vehicle accident, but noted no other findings.  (Tr. 596).  One month later, Dr. Colvin observed continued tightness in Termine's neck musculature, with functional range of motion.  (Tr. 594).

The ALJ had good cause to discount Dr. Steck's October 2014 and April 2015 opinions based on the medical treatment records discussed above and because of their checklist format.  Appellate courts, including the Fifth Circuit, have often held that checklist opinions are unworthy of credence when they are not adequately supported by or are inconsistent with the medical records.  See Foster v. Astrue, 410 F. App'x 831, 833 (5th Cir. 2011) ("[T]he 'questionnaire' format typifies 'brief or conclusory' testimony. . . .  [W]e agree with the magistrate judge's conclusion that 'due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations, [the treating physician's] opinion is given little weight.'"); Peck v. Barnhart, 214 F. App'x 730, 738 (10th Cir. 2006) (The ALJ provided legitimate reasons for rejecting a doctor's opinion consisting "of checked boxes and circled numbers on a form" when the "opinion was not supported with additional explanation" nor justified by the doctor's treatment notes.); Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) ("the checklist format, generality, and incompleteness of the assessments limit their evidentiary value"); Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999) (upholding ALJ's rejection of physician's check-box form when it was contradicted by evidence in the record); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (quotation omitted)

("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. . . . [When] these so-called reports are unaccompanied by thorough written reports, their reliability is suspect . . . ."); Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987) ("Such evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence."); cf. Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010) (citing Johnson, 189 F.3d at 564; Mason, 994 F.2d at 1065) ("Although by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records. . . . Here, there is a long record of treatment by [the treating physician] that supports his notations on the form.").

"The ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" Ramirez v. Colvin, 606 F. App'x 775, 779 (5th Cir. 2015) (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); accord Yates v. Colvin, 606 F. App'x 225, 229 (5th Cir. 2015) (citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)). "In declining to give controlling weight to Dr. [Steck's] questionnaire responses, the ALJ performed [his] role of weighing conflicting evidence and resolving the conflict, and we perform our limited role of ensuring that this decision is supported by substantial evidence, which it is." Heck v. Colvin, 674 F. App'x 411, 415 (5th Cir. 2017) (citing Greenspan, 38 F.3d at 237). When the ALJ has relied on reports from examining and reviewing physicians and adequately dealt with any dispute

28

between them, his residual functional capacity determination "must be upheld under the substantial evidence standard, because reliance on the analysis of these doctors is more than a mere scintilla, and any evaluation of the accuracy of the analysis is beyond the scope of this court's review." Fontenot, 661 F. App'x at 277 (citing Taylor, 706 F.3d at 603; Perez, 415 F.3d at 461; Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).

The ALJ's finding that plaintiff's history of drug-seeking behavior undermines the credibility of her pain complaints in light of the lack of objective findings is substantially supported by the evidence. Termine had positive urine drug screens for cocaine and non-prescribed medications in 2006, 2010 and 2012 (Tr. 266, 360, 373), and her requests for higher opioid doses and/or anti-anxiety medication in 2011 and 2012 were declined by her treating doctors, who were not comfortable with granting those requests. (Tr. 333, 337, 355). Plaintiff's more recent history includes Dr. Munshi's decision to discharge her from pain management in August 2014 after her drug screen was positive for cocaine and non-prescribed medications. (Tr. 386-80). On September 18, 2014, Dr. Steck opined that Termine should discontinue narcotic pain medication because of her physical and psychological dependence on it. (Tr. 520). Dr. Colvin declined plaintiff's request to increase her opioid medication on December 22, 2014. (Tr. 602). Termine told Dr. Colvin on April 15, 2015 that she wanted to take a trip to Georgia and "she wants me [Dr. Colvin] to write for her medications for today's date." Dr. Colvin stated that plaintiff "has overtaken her medications" given at her previous visit and that Dr. Colvin

"can't [write another prescription]. . . . I explained to [Termine] that she can't overtake her medications." (Tr. 594).

Determining the credibility of her subjective evidence of pain and disability is a necessary part of the ALJ's consideration of the evidence. Luckey v. Astrue, 458 F. App'x 322, 326 (5th Cir. 2011) (citing Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Perez, 415 F.3d at 462. The ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in his articulation.'" Hernandez v. Astrue, 278 F. App'x 333, 339 (5th Cir. 2008) (quoting Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)). The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'" Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164). Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court. McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009) (citing Newton, 209 F.3d at 459); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007) (citing Newton, 209 F.3d at 459). The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. Undheim v. Barnhart, 214 F. App'x 448, 450-51 (5th Cir. 2007) (citing 20 C.F.R. § 404.1529(c); Falco, 27 F.3d at 164); James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No. 98-1680, 1999 WL 179476,

at *9 (E.D. La. Mar. 31, 1999).  The ALJ complied with these standards in the instant matter.

Although this court might reach a different conclusion if it were the initial factfinder, the applicable legal standard of review requires that it cannot reweigh conflicts in the evidence.  The ALJ need not address each aspect of the record in detail. "[T]here will always be some evidence that is not specifically discussed in the Commissioner's decision.  Our review is limited to examining whether the decision to deny benefits is supported by substantial evidence in the record, and it is here.  Likewise, the Commissioner used the proper legal standards to evaluate the evidence, and the ALJ adequately resolved inconsistencies in the record."  Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011).  Accordingly, plaintiff's first two assignments of error lack merit.

> 4.    The ALJ considered all of the evidence he found credible to determine plaintiff's residual functional capacity to sustain employment.

In her final assignment of error, Termine argues that the ALJ's residual functional capacity assessment and findings that she could perform either her past relevant work as a waitress or the alternative jobs of information clerk or customer service representative was not supported by substantial evidence.  (She does not mention the ALJ's finding that she could also perform the job of general office clerk.)  Aside from relying again on Dr. Steck's opinions, to which the ALJ was entitled to give little weight, as discussed above,

plaintiff contends that she cannot sustain gainful employment because she testified that she could not tilt her head forward or back on a regular basis or turn it from side to side.

Termine asserts, incorrectly, that the vocational expert testified that a person with that limitation could not perform any of the jobs identified by the ALJ. The hypothetical posed by plaintiff's attorney included a limitation that the person could rarely twist her neck from side to side or "lean upwards or forwards at the neck." Riggle testified that such an individual could not perform the jobs of waitress or customer service representative, but could work as an information clerk. (Tr. 55-56).

The ALJ was not required to accept plaintiff's testimony regarding her subjective complaints. The ALJ posed a hypothetical to the vocational expert that accounted for plaintiff's age, education, work experience, and physical limitations, which the ALJ found to be credible. The hypothetical contained several postural limitations, including no overhead reaching, to account for a decreased range of motion in Termine's neck, to the extent the ALJ found that limitation was supported by the evidence. Riggle testified that such a claimant could perform plaintiff's past relevant work or the three other jobs that she identified.

Termine was represented by counsel at the hearing, and her counsel also questioned the vocational expert. An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct

32

deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994); accord Vaught v. Astrue, 271 F. App'x 452, 456 (5th Cir. 2008); Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

Termine's counsel questioned the vocational expert and asked her about the effects of plaintiff's alleged additional impairments.  Although Riggle testified that such a claimant could not perform any jobs, the ALJ found that the record did not support the extreme restrictions posited by plaintiff's attorney.  Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ used the appropriate legal standards to weigh and resolve conflicts in the medical opinion evidence.  His residual functional capacity findings and determination that Termine can perform either her past relevant work or the other three jobs identified in his decision are supported by substantial evidence.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[12]

New Orleans, Louisiana, this ___16th___ day of April, 2018.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[12]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.